Filed 5/21/15  P. v. Montes CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERICK MONTES,<br><br>    Defendant and Appellant. | B254824<br><br>(Los Angeles County<br>Super. Ct. No. BA358831) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, and Michael C. Keller and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Erick Montes appeals from the judgment entered after his conviction by jury of attempted premeditated murder, assault with a semiautomatic firearm, shooting at an occupied motor vehicle, and possession of a firearm by a felon.  Defendant contends that all of his convictions must be reversed because the trial court did not conduct an appropriate inquiry into his posttrial claim of ineffective assistance of counsel, failed to ensure that he knowingly and intelligently waived his right to counsel, and improperly admitted evidence of an unrelated murder, ongoing wiretaps against members of his gang, his arrest during a "sweep" of the gang, and a "rap poem" he authored.  Defendant further contends that the prosecutor improperly referenced unrelated gang murders during closing arguments.  He also specifically attacks the assault conviction, arguing that the court improperly instructed the jury as to the required mens rea and that he lacked mens rea in any event because he was not aware of the assault victim's presence.  We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

### I.    Procedural Background

On December 23, 2009, defendant was charged with attempted premeditated murder (Pen. Code §§ 187, subd. (a), 664 (count 1)),[1] assault with a semiautomatic firearm (§ 245, subd. (b) (count 2)), shooting at an occupied motor vehicle (§ 246 (count 3)), and possession of a firearm by a felon (§ 12021, subd. (a)(1) (count 4)).  The information specially alleged all of the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186, subds. (b)(1)(A), (b)(1)(C) & (b)(4)), that count 1 was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)) that a principal personally and intentionally discharged a firearm, causing great bodily injury, and that defendant personally inflicted great bodily injury in counts 1 and 3 (§§ 12022.53, subds. (b), (c), (d), (e) & (e)(1), 12022.7, subd. (a)), and that defendant personally used a firearm in connection with count 2 (§ 12022.5, subd. (a)).  The information further alleged that defendant suffered convictions of a prior

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

serious or violent felony (§§ 667, subds. (b)-(i), 1170.12) and a serious felony (the same one) (§ 667, subd. (a)).[2]

Defendant proceeded to jury trial in July 2011. The court declared a mistrial after the jury reported a deadlock of 11-1. The People elected to retry defendant, and a second trial commenced in July 2012. The jury found defendant guilty as charged and found true all of the special allegations, including the allegation on count 2 that defendant personally used a firearm during the commission of the assault. Defendant waived his right to jury trial on the prior convictions and subsequently admitted them.

Defendant's trial counsel moved for new trial and contemporaneously informed the court that defendant wanted to expand the motion to allege that trial counsel committed prejudicial errors during jury selection. Trial counsel explained, "If that were the case, I would have to conflict as to that and have another attorney appointed to review the voir dire and see what's appropriate." He further noted that "Mr. Montes also indicated . . . that he was thinking of proceeding in pro per." The trial court asked defendant to clarify his wishes, and the following exchange ensued:

"The Defendant: I want to put in this motion for retrial. And if the court - - if it does not get granted, I would like to go pro per.

"The Court: You want to make a motion - - do you want me to hear Mr. Lindars [defendant's counsel] motion or you want to withdraw it and represent yourself and file some other motion?

"The Defendant: I want to do both, really, if that's possible. [¶] I don't know much about the law.

"The Court: That's my point. That's exactly my point. I can tell you Mr. Lindars does. I've known him for years. He's been doing this a long time. And Mr. Dickman [the prosecutor] does.

"The Defendant: But my rights were violated through this case.

---

[2]     The information alleged that defendant suffered a prison prior (§ 667.5, subd. (b)), but the trial court ordered the allegation stricken on the People's motion.

"Mr. Lindars: I think what he wants to do, your honor, is proceed on this issue and the issue pertaining to the jury selection. [¶] Is that right?

"The Defendant: Yes.

"The Court: I think rather than have them do it piecemeal, I guess I'd want to hear from Mr. Dickman. [¶] Generally, all the motions, all the grounds, would be raised in one motion. [¶] I'm assuming that Mr. Lindars didn't see a ground for raising this issue about jury selection. The defense exhausted their peremptories. [¶] But if he's now trying to raise some kind of I.A.C. [ineffective assistance of counsel] claim, I agree that Mr. Lindars can't do that . . . .

"[¶] . . . [¶]

"The Court: Maybe - - I'm just thinking out loud - - maybe the thing to do is have Mr. Montes go through the Faretta form. If I then grant his Faretta motion, he can then file whatever motion he wants to file and he can incorporate this and add to it, if he wants to, and then you'll have your statutory time to respond to everything.

"Mr. Lindars: I think his preference is that he have counsel to proceed on the jury voir dire issue as opposed to doing it himself. [¶] Is that right?

"The Defendant: I don't know much about the law.

"The Court: I know you don't. [¶] I'm going to have to research this, Mr. Lindars. [¶] I don't think the court has an obligation to appoint - - just because he's now dissatisfied with the way you handled the jury selection, I don't think he's entitled to have a different appointed lawyer. [¶] He would be permitted on appeal to have an appointed lawyer who can raise any I.A.C. claims he or she believes are in the record. I don't believe he has a right to just fire his court-appointed lawyer and get a new and different court-appointed lawyer to raise I.A.C. at this level. [¶] I would have to research that, but I do not think he's entitled to that. In every single case, we'd be appointing a new lawyer to read boxes of records just because the defendant has been convicted. Now I think my lawyer didn't handle some issue correctly."

The court put the matter over. At the next hearing, on February 1, 2013, the court noted that the prosecution recently had provided trial counsel with approximately 1200

4

pages of potential *Brady*[3] material. Trial counsel told the court, "I discussed that with Mr. Montes. He wishes to proceed in pro per." Defendant submitted a completed *Faretta*[4] waiver form and the court orally questioned him, asking him whether he realized he was "going to be up against a very experienced district attorney on the other side," that he was "going to be held to the same standard as any other attorney and not given special breaks," and that the court "can't be [his] lawyer and [ ] can't answer [his] questions." After defendant answered all of these questions affirmatively, the court asked him if he was sure he wanted to proceed pro. per. Defendant affirmed that he wanted to proceed in pro. per. The court granted his *Faretta* motion and relieved trial counsel.

For the next year, defendant proceeded in pro. per., filing numerous discovery, continuance, and other motions and appearing in court for hearings on those motions. Eventually, the court set a deadline for defendant to file his motion for new trial, which he timely filed on January 22, 2014. The court orally issued a tentative ruling denying the motion on February 6, 2014, and finally denied it on February 10, 2014 after hearing more than an hour of oral argument from defendant.

The court sentenced defendant immediately after denying his motion for new trial. Defendant timely filed a notice of appeal.

## II. Evidence At Trial

### A. Prosecution's Evidence

#### 1. The Shooting

Eber Tohom picked up his daughter, Barbara Tohom, and two of her friends from their high school prom around midnight on April 26, 2009.[5] One of the friends sat in the front passenger seat of Eber's blue Ford Explorer, Barbara sat in the middle of the backseat, and her other friend sat next to her. Eber drove the two friends to their homes and dropped them off. Barbara remained in the backseat.

---

[3]     *Brady v. Maryland* (1962) 371 U.S. 812.

[4]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[5]     We refer to the Tohoms by their first names to avoid confusion.

At a little past 1:00 a.m., Eber was trying to navigate out of the second friend's "kind of confusing" residential neighborhood near the juncture of the 2 freeway and the 5 interstate. Eber approached the intersection of Atwater Avenue and Carillon Street with the intention of making a left turn. He stopped at the intersection to let an oncoming white four-door sedan pass. Barbara described the sedan as a "foreign car," and Eber testified that he saw a BMW logo on the hood.

Instead of passing Eber's car, the BMW stopped alongside it so that the driver's open window was across from Eber's open window; the cars were about three to six feet apart. The male driver, the only occupant of the BMW seen by either Eber or Barbara, yelled "fuck you" at Eber "out of nowhere." Barbara described the driver as "angry," and Eber described the driver as yelling in a "bad, evil way."

Scared, Eber drove his car forward and around the back of the BMW in an attempt to complete the left turn. He and Barbara then heard gunshots. Barbara said or yelled something to the effect of, "Dad, they're shooting at us," ducked down, and started screaming. Barbara testified that she heard "a lot" of gunshots, and Eber testified that he heard "many." The car was struck "[a]pproximately 13" times.

Eber tried to accelerate, but he felt something hot in his leg, lost control of his vehicle, and wound up crashing it into a car parked on the street. Barbara testified that Eber yelled, "They shot me, they shot me" and told her to call 911. Eber testified that he told Barbara, "I think I got shot," and told her to call 911. Barbara's call did not go through, so Eber drove to a nearby police station. An ambulance transported Barbara and Eber from there to a hospital. Eber was treated for a gunshot wound behind his knee, which "broke" his nerve and "dropped" his foot such that he could not feel it. At the time of trial more than three years later, Eber testified–and demonstrated for the jury–that his left foot remained partially paralyzed.

Detectives later recovered 21 nine-millimeter casings from the scene. Sheriff's department firearms expert Edmund Anderson opined that 16 of the casings were fired from one firearm, and five were fired from a second. He testified that all of the casings came from semiautomatic firearms. Anderson was able to determine that none of the

6

casings were fired from a Glock firearm, but could not determine the specific manufacturer of either firearm.

### 2. Identification of Defendant

Los Angeles Police Department (LAPD) officer Demetrio Mendoza spoke to Eber while he was at the police station waiting for the ambulance. According to Mendoza, the only information he got from Eber at that time "was a white B.M.W." Mendoza included that description in the "face sheet" of his report but included only "white car" in the narrative portion of the report. In a second interview with Mendoza at the hospital, Eber confirmed that the car was a white BMW. Eber did not provide Mendoza with any information about the suspect; Mendoza documented "N.S.S.," for "no suspect seen," in his report.

LAPD detective Christopher Vasquez testified that he spoke with Eber on the telephone the next morning. (Eber had no recollection of speaking with Vasquez on the phone.) According to Vasquez, Eber reiterated his description of the BMW and further described the driver as a medium-build Hispanic male with a mustache whom he believed he would be able to identify. Eber said he described the shooter as bald, with a mustache, and "[s]omething on the bottom of the mouth, or his beard." Eber's description made Vasquez think of defendant, who he knew owned a white BMW and belonged to a gang that had rivals in the area of the shooting. Vasquez prepared a "six-pack" photo lineup that included defendant's photo and took it to Eber's home. Eber pointed to defendant's photo, said "that's him," and started crying. Eber also identified defendant at trial. Barbara, who testified that she "didn't get a very good look" at the shooter because everything happened so quickly and she "couldn't really look outside the window that well," was not able to identify or describe the shooter.

### 3. Gang Evidence

#### a. The Toonerville Gang

LAPD sergeant John Strasner testified as the prosecution's gang expert. He worked in the gang enforcement detail at the Northeast station from 2004-2008. Approximately 10 to 15 gangs called the Northeast precinct home, including "violent"

7

rivals Toonerville and the Rascals. Defendant had a Toonerville tattoo on his back and was shown throwing Toonerville gang signs in a photo taken one week before the shooting. The shooting occurred on "the south most street of the Rascal's [*sic*] gang" territory, "deep within the area controlled by the Rascals." Toonerville members previously had committed two murders in that same area. One of the murders, the February 2008 shooting of a Rascal, occurred on the same street, "approximately a block and a half" from the Tohom shooting. The other, which occurred on December 26, 2008, was "just a few blocks away from Atwater and Carillon," "a quarter mile at most." Strasner also testified about two other homicides that served as some of the prosecution's "predicate acts": an April 14, 2006 murder committed by Toonerville member Isael Aguirre and a December 24, 2006 murder committed by Toonerville member Patrick Evans.

In addition to murders, Toonerville's 300-400 members engaged in the primary activities of vandalism, "dope sales," and assaults. Like other gangs in Los Angeles County, Toonerville "generate[d] funds through illegal means, by selling narcotics, committing robberies, extortions, things of that nature." Toonerville operated "under fear, intimidation, respect." Members would earn respect and ascend the "gang ladder" by "put[ting] in work," or engaging in illegal activities ranging from graffiti "tagging" to murder. The majority of the members were Hispanic males.

When given a hypothetical based on the facts of this case, Strasner opined that the shooting would have been committed "to further the gang and promote their activities."

### b.     The "Toonerville Task Force" and Wiretaps

Two members of the Mongol Outlaw Motorcycle gang were shot at near the juncture of the 2 and 210 freeways in October 2008. Glendale police detective Arthur Frank quickly "focus[ed] in" his investigation on two suspects, both of whom were Toonerville gang members. Frank contacted the LAPD, and the two departments formed a joint "Toonerville Task Force" (the Task Force). The Task Force "employed several investigative means," including wiretaps, to gather intelligence about members of the Toonerville gang in an attempt to clear unsolved cases. Frank explained that to get

8

authorization for a wiretap, "You have to prepare an affidavit to explain probable cause and the need for the wiretap and we present it to a judge who authorizes the intercept of the phone calls." The prosecutor then asked, "And, in fact, in the affidavit, don't you have to point out that there's really no other means, or you have to go through all the other means that you have exhausted and tapping into someone's phone is the last resort?" When Frank said that was "correct," the prosecutor continued, "So a wiretap is a pretty heavy undertaking?" Frank agreed "[i]t is." He later testified that "there's a lot to do" before a wiretap can be authorized: "[y]ou have to show the necessity that that's the last resort, the wiretap." Defendant did not object to the prosecutor's questions or Frank's answers, although he did object to the admission of the wiretap evidence prior to trial.

The Task Force began using wiretaps to listen to Toonerville gang members' phones in November 2008. The Task Force initially obtained authorization to monitor six phones, but the scope of its surveillance expanded to include 19 phones by the time the last wiretap expired in July 2009. Frank confirmed that the Task Force had "to get approval from the judge to add each subsequent number" and had to "continually seek approval from the judge to continue the investigation on the phones that [it] had prior approval on." In total, the Task Force monitored between 40,000 and 50,000 phone calls, text messages, and voice mails, as well as 1,500 to 2,000 "jail calls" involving at least one incarcerated party.

The Task Force arrested 20-25 members of the Toonerville gang, including defendant, in a coordinated sweep on July 9, 2009.

### c. Cell Phone Records

The Task Force conducted surveillance and used other investigative methods to determine the identities of the people contacted by the gang members whose phones were monitored. One method they used was obtaining "search warrants for phones to get call data information, including cell site, phone numbers, calls in and out," all of which were listed in call detail reports, or CDRs, generated by cell phone companies. The CDRs as provided did not include subscriber names; the Task Force developed that information

9

from the intelligence gathered during the eight-month wiretap. Although the wiretap operation was "down" at the time of the Tohom shooting, and defendant's cell phone was not a direct target until May 2009, the Task Force was able to obtain a CDR documenting the activity of his cell phone during the 48 hours surrounding the shooting. The Task Force, in collaboration with an organization called L.A. Clear, supplemented the entries in the CDR with names.

Chad Fitzgerald, a special agent with the FBI, testified about the CDR pertaining to defendant's cell phone. Fitzgerald "kn[e]w nothing of the investigation" aside from a "brief synopsis." He was "only involved in it to analyze the cell phone activity." Based on the data in the CDR, Fitzgerald concluded that defendant's cell phone arrived in the Glendale area at about 2:46 a.m. on April 24, 2009 and left at about 10:00 p.m. on April 26, 2009. Fitzgerald was not able to tell whether defendant personally used the phone at those or any other times; he could tell only that the phone was being used in that particular area.

The CDR showed that defendant's phone made outgoing calls at 12:09, 1:33, 1:35, 1:43, 2:37, 2:55, 2:57, 2:58, 3:04, 3:10, 3:22, 3:31, 3:46, and 4:58 a.m. on April 26, 2009. The call at 12:09 was to a number associated with Toonerville member Santiago Ayala, and the calls at 1:33, 1:35, and 1:43 were to a number associated with Toonerville member Jose Palma. Defendant's phone received incoming calls at 12:23, 1:30, 1:48, 1:49, 2:01, 2:04, 2:07, 2:59, 3:47, and 5:51 a.m. that same morning. At least two of the incoming calls, those most proximate to the time of the shooting, 12:23 and 1:30, went to voicemail. None of the calls was facilitated by the cell phone tower that serviced the area of the shooting. All were facilitated by three Glendale-area cell phone towers. The use of these three towers was equally consistent with appellant driving through the Glendale area or remaining stationary at 4051 Chevy Chase Drive, which was "very close to the border of all three of these towers."

### d.     The Poem

In July 2008, LAPD detective Harold Dicroce served a search warrant at the home of Toonerville gang member Erick Ceballos. Dicroce recovered a letter dated May 18,

10

2007 that defendant had written to Ceballos. The letter contained a poem entitled "The Ville Life," signed by "Deadz." Gang expert Strasner testified that "Ville" referred to the Toonerville gang and the area the gang claims as its turf, and that "Deadz" was a reference to defendant's gang moniker, Lil' Deadman. Strasner also offered opinions about several turns of phrase in the poem, which included the following lines:

"Standing on Chevy Chase block, the heart of my hood, watching out for lil' homies, always up to no good.

"[¶] . . . [¶]

"Watching the cars with my scope and my gun in hand, hoping they come through my hood so I could make them understand, that this shit isn't a game and it ain't for the fame, it's for the vengeance and pain, but hatred is mainly to blame.

" [¶] . . . [¶]

"Fuck the Noodles and the Trash, we'll show them how we smash.

"[¶] . . . [¶]

"Fuck the Mocos and the Fags, we'll leave you all in body bags. So we'll continue this shit until the last of you cease to exist . . . .

"[¶] . . . [¶]

"Sober or if I'm lit, my Sig will constantly spit."

"[¶] . . . [¶]

"My streets will always come fiend for the blood of my enemy . . . .

"[¶] . . . [¶]

"You better come strapped to the 'T' because the flame of my Glock, you will see.

"[¶] . . . [¶]

"So don't come down Chevy Chase Street, cause that will be your final defeat and you'll find that you can't compete and the hands of death you will meet. So now you know the deal, so duck when you see my steel, cause we're coming to kill for the big bad Toonerville. [¶] That's Ville'n poetry, Deadz."

According to Strasner, Chevy Chase Drive was the location of the Toonerville gang's main gathering point. "Noodles," "Trash," "Mocos," and "Fags" were,

11

respectively, references to the Avenues, Rascals, West Side Locos, and Frogtown gangs, all of which were Toonerville rivals. The term "lit" referred to being high or drunk, "Sig" and "Glock" were types of guns, "strapped" meant "come armed," or "have a gun," and "spit" meant "spit fire."

On cross-examination, Strasner conceded that the poem "could be" consistent with rap lyrics. He further testified that he had seen "a few" Hispanic gangs that actually produced rap CDs, and that songs contained on rap CDs talk about topics like street violence.

### B. Defense Evidence

#### 1. Alibi Witnesses

Defendant presented an alibi defense, testifying on his own behalf that he was at a friend's house for a birthday party at the time of the shooting. He also called three witnesses in support of his alibi.

Beatris Montes had known defendant his whole life but was not related to him. In 2009, she lived at 4051 Chevy Chase Drive with Defendant's then-girlfriend, Desiree Smith, who by the time of trial was deceased. On Saturday, April 25, 2009, Montes hosted a birthday party for herself at her home. Approximately 50 people attended the party.

Defendant arrived at Montes' house in his white BMW at about noon to help her prepare food and barbecue for the party. He initially parked on the street, but later moved his car into Montes' driveway. His was the only car aside from Montes' parked in the driveway. Other guests started arriving around 4:00 or 5:00 p.m. Montes took a photograph with defendant at 5:49 p.m.

Defendant and Smith were still at the party when Montes retired to her bedroom at 10:00 p.m. At some point after that, Montes, who was awake until about 3:00 a.m., heard defendant's car start in the driveway, right outside her bedroom window. She heard defendant and Smith talking as well. Montes heard defendant's voice after she heard the car drive away. She did not know how many people were in the car or where it went. Both defendant and Smith were at her house when she woke up the next morning.

12

Montes knew defendant was arrested in July 2009 but was unaware what he was arrested for until she spoke with his private investigator, Lawrence DeLosh, in July or August 2010.

Patricia Vallejo, who lived across the street from Montes in 2009, also knew defendant his entire life. Her son, Manuel, was a Toonerville gang member. She testified that she went to Montes' 2009 birthday party at about 7:00 p.m. and saw defendant among the 50 or so people there. His car was in the driveway. Vallejo saw Smith leave the party alone in defendant's car sometime around 9:00 or 9:30 p.m. and return around 12:30 or 1:00 a.m. When Vallejo left the party around 1:00 a.m., she said good-bye to both defendant and Smith. She did not think defendant seemed "drunk or anything like that." Vallejo admitted that she once was arrested for "interfering" with the police.

Wendy Sandoval, a family friend of defendant's who "grew up together with him" but currently ran in a different crowd, testified that she attended Montes' birthday party on a Saturday in 2009. Defendant and Smith were among the five or six people she knew there. Sandoval saw defendant barbecuing when she arrived at the party between 5:00 and 6:00 p.m. She left the party between 8:00 and 9:00 p.m. A Lakers game was on television while she was there. Defendant later introduced a document showing that the Lakers played the Utah Jazz on April 25, 2009.

### 2. Defendant's Testimony

Defendant testified that he grew up in the Toonerville area of Los Angeles and joined the Toonerville gang when he was about 12 or 13 years old. He joined the gang because "[i]t was just around [him] everywhere." Many of his relatives were members and he "didn't know what [he] was doing." He got a Toonerville tattoo on his back when he was about 16 or 17. He had previous felony convictions for marijuana sales and criminal threats, and had been in jail since his arrest in this case on July 9, 2009. He continued to "claim" Toonerville in custody because "[t]he politics in jail" left him "no choice." Defendant was familiar with other street gangs in the Toonerville area and

13

acknowledged that the Tohom shooting took place in Rascals territory, about a five-to-seven minute drive from Montes' house.

Defendant was at Montes' house, in Toonerville territory, for her birthday party at the time of the shooting. He arrived there in his white BMW 740i around noon on April 25, 2009 and helped Montes prepare for the party by "going back and forth to the city yard, getting ice, and just preparing the food." He picked up ice on his last trip from Montes' house and drove his car up the driveway to unload the ice chest from his trunk. Defendant did not move the car from the driveway until after the sun came up on April 26, 2009. His then-girlfriend Desiree Smith "was supposed to" use his car on the evening of April 25, 2009, however.

Defendant was drinking while he barbecued at Montes' party and eventually became intoxicated. He "might have been buzzed" when he took the photo with Montes at 5:49 p.m. but did not think he was drunk at that time. Defendant believed he passed out on the couch at some point but did not know when. He ultimately woke up in Smith's bedroom the next day, after the sun was up. Defendant did not recognize the names associated with some of the phone numbers that called his cell phone during the night. He conceded on cross-examination that some Toonerville members use "burner lines," or cell phones registered under fictitious or stolen names and addresses. Defendant testified that he did not leave Montes' house on the evening of April 25, 2009 and stated that he "never committed that crime" against the Tohoms; there was "no way [he] did something like that." Before his arrest, he worked for the City of Los Angeles for 10 years maintaining and repairing playground equipment.

Defendant described himself as Hispanic but indicated that he was given his moniker, Little Deadman, because of his pale complexion. Defendant stood about 5'5" tall and his weight fluctuated between 170 and 185 pounds. He had shaved his head for about ten years, maybe longer, and had worn a goatee for about four or five years.

Defendant admitted to writing the poem recovered from Ceballos' house. He was in custody at the time and did not yet have the City job; he "was broke" and "was trying to rap, trying to make money." He acknowledged that the poem, which he described as

14

"a rap," talked about engaging in violence against other gangs, but explained, "It's just a rap song." He continued, "I mean Eminem raps about killing his baby's mom and he doesn't really do it." Defendant had written other non-rap poems, including one that was read at his grandmother's funeral in 2008.

On cross-examination, defendant admitted that people who generate "paperwork" by cooperating with the police are in danger. If Eber Tohom walked through Toonerville now, "there would be a problem." Toonerville members might even shoot or kill him. Defendant admitted that it "would be considered something pretty brave" to go into a rival gang's territory and "put in work" there. Defendant did not know why various gangs hated one another and said that he had seen gang members "just shoot each other for no reason." That is why he was wearing body armor when he was stopped by police in 2006. Defendant denied that he was throwing gang signs in the prosecution's photo. He also denied ever committing "violent crimes."

### C.     Rebuttal

The prosecution called defendant's private investigator, Lawrence DeLosh, as a rebuttal witness. DeLosh testified that he interviewed Montes sometime between December 2009 and July 2011. Montes told him that defendant came to her party early to help her barbecue and moved his car into the driveway at around 9:00 p.m. She went to her bedroom at 10:00 p.m. and heard defendant's car start and leave sometime after that. She heard defendant's voice but did not hear Smith's. She said her party was on April 24, 2009.

DeLosh spoke to Sandoval on the phone in September 2011. She told him she was at Montes' party on a Saturday and that a Lakers game was on television during it. DeLosh later verified that the Lakers had a game on April 25, 2009. DeLosh took Vallejo's statement by email.

15

## I. Challenges to the Assault Conviction

### A. Jury Instructions on Mens Rea

Defendant contends that his conviction on count 2, for assault of Barbara with a semiautomatic firearm (§ 245, subd. (b)), must be reversed because the court incorrectly instructed the jury as to the knowledge element required to sustain the charge. He makes two related arguments, both of which implicate CALCRIM No. 252 (Union of Act and Intent: General and Specific Intent Together). First, he claims CALCRIM No. 252 inaccurately described assault as a general intent crime rather than "one that requires a specific mental state, knowledge, that must be proved by the evidence." Second, he claims that the erroneous instruction "diluted the prosecution's burden of proof" on the mens rea element by telling "the jurors that if they find the act was committed, then the knowledge is also present." That is, he contends, it "creates the presumption by telling the jurors how to decide if the intent is shown," thereby relieving the prosecution of its burden to independently prove knowledge. We reject both contentions.

The trial court has a sua sponte duty to instruct the jury on the elements of a charged offense. (*People v. Mil* (2012) 53 Cal.4th 400, 409.) No objection is required to preserve for appellate review a claim that the jury instructions omitted an essential element of the charge. (*Ibid.*) "The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Count 2 charged defendant with assaulting Barbara with a semiautomatic firearm. The court instructed the jury on the elements of the crime using CALCRIM No. 875 (Assault with Deadly Weapon or Force Likely to Produce Great Bodily Injury), which defendant does not dispute accurately described the elements of the crime. That instruction charges the prosecution with proving four elements: "1. The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3.

16

When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;  [¶]  AND  [¶]  4.  When the defendant acted, he had the present ability to apply force with a semiautomatic firearm."

Defendant contends that the mens rea element of this instruction was undermined by the court's  modified version of CALCRIM No. 252.  That instruction provided in pertinent part:  "The crimes and other allegations charged in this case require proof of the union, or joint operation, of act and wrongful intent.  [¶]  The following crimes and allegations require general criminal intent:  assault with a semi-automatic firearm, charged in Count 2 and as a lesser included offense to attempted murder, charged in Count 1 . . . . For you to find a person guilty of these crimes or to find these allegations true, that person must not only commit the prohibited act, but must do so with wrongful intent.  *A person acts with wrongful intent when he intentionally does a prohibited act*; however, it is not required that he intend to break the law.  The act required is explained in the instruction for that crime or allegation."  (Emphasis added.)

The challenged instruction properly characterizes assault as a general intent crime. In *People v. Williams* (2001) 26 Cal.4th 779, 788 (*Williams*), its most recent case thoroughly explicating the mental state required for assault, the Supreme Court reaffirmed its longstanding holding that "assault does not require a specific intent to injure the victim" and clarified that "[a]ssault is still a general intent crime," notwithstanding the requirement that a defendant "be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct."  (See also 1 Witkin, Cal. Crim. Law (4th ed. 2012) Elements, § 5, p. 266 ["The fact that a criminal statute requires an act to be done knowingly does not mean that the act calls for specific, rather than general, intent."].)  Indeed, the *Williams* court expressly held "that assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur.  Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against

17

another." (*Williams*, *supra*, 26 Cal.4th at p. 790.)[6] We accordingly are not persuaded by defendant's contention that the court erred in "giving a general intent instruction where a greater mental state is required." Nor are we persuaded by his attempt to analogize this case to *People v. Hill* (1967) 67 Cal.2d 105, 118, which involved the specific intent crime of burglary.

We also find unpersuasive defendant's contention that CALCRIM No. 252 as given by the trial court lessened the prosecution's burden of proof by effectively removing the element of knowledge from the jury's consideration. He specifically takes issue with the sentences, "*A person acts with wrongful intent when he intentionally does a prohibited act*; however, it is not required that he intend to break the law. The act required is explained in the instruction for that crime or allegation." (Emphasis added.) In his view, this language, particularly that italicized above, impermissibly instructs the jury that the prosecution may satisfy its burden of demonstrating his intent merely by showing that he committed an unlawful act. However, as a general intent crime, assault *is* "'established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery.' ([*People v.*] *Colantuono* [1994] 7 Cal.4th [206,] 214; see *Williams*, *supra*, 26 Cal.4th at p. 782.)" (*People v. Chance* (2008) 44 Cal.4th 1164, 1169.) The same is true of the other general intent crimes and special allegations covered by the instruction, which defendant notably has not challenged. The instruction is a correct statement of law properly given when general and specific intent crimes are charged together (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1189-1190), and if defendant desired clarifying or amplifying language, his failure to request it below forfeits the challenge. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

Additionally, the court admonished the jurors to consider the instructions as a whole, and we presume jurors are intelligent persons capable of correlating and following

---

[6] The Supreme Court has reiterated the vitality of *Williams* in more recent cases. (See, e.g., *People v. Bailey* (2012) 54 Cal.4th 740, 750; *People v. Hernandez* (2011) 51 Cal.4th 733, 747; *People v. Wyatt* (2010) 48 Cal.4th 776, 780-781.)

18

the instructions. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) CALCRIM No. 252 referred the jurors to "the instruction for that crime," CALCRIM No. 875, which correctly specified the requisite mens rea accompanying the act. Reading the instructions together, as directed, the jury would understand the offense required both an intentional act and an awareness of the direct and probable danger of application of force to a person.

## B.      Sufficiency of the Evidence

Defendant next contends that the evidence is insufficient to support his conviction on count 2 because there is no evidence that he knew of Barbara's presence and therefore "there is no evidence that [he] knew that his act would directly and probably result in the application of force to her." In other words, he claims the prosecution failed to prove he acted with the requisite mens rea to be guilty of assault.[7] We disagree.

When considering the sufficiency of the evidence, we view the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence, i.e., evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the essential elements of the charged crime or allegation proven beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

The Supreme Court clarified in *Williams*, *supra*, 26 Cal.4th at p. 784 that "assault requires actual knowledge of those facts sufficient to establish that the offending act by its nature would probably and directly result in physical force being applied to another." "In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize a battery would directly, naturally, and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*Williams*, *supra*, 26 Cal.4th at p. 788.) The trial court correctly instructed the jury on this mens rea element. (See *People v. Velasquez* (2012) 211 Cal.App.4th 1170,

---

[7]      We note that he does not challenge the court's instruction, in CALCRIM No. 875, that "The People are not required to prove that the defendant actually intended to use force against someone when he acted."

1176.)  Defendant nonetheless contends that the prosecution failed to meet its burden of proving that he *actually knew* that his acts would probably result in the application of force to Barbara because there was no evidence he knew she was in the car.[8]

The Fourth District Court of Appeal considered and squarely rejected an identical argument in *People v. Trujillo* (2010) 181 Cal.App.4th 1344, review denied May 20, 2010 (*Trujillo*).  There, as here, defendant "fired numerous shots from a semiautomatic rifle at another moving car.  The other car had two occupants, a driver and a backseat passenger," and the defendant contended "the evidence is insufficient to convict him of two counts of assault because he had no knowledge of the backseat passenger in the car he was shooting at." (*Trujillo*, *supra*, 181 Cal.App.4th at pp. 1347-1348.)  The *Trujillo* court disagreed for a number of reasons.

First, it echoed the court in *People v. Felix* (2009) 172 Cal.App.4th 1618, 1629 by concluding that objective foreseeability is the appropriate consideration under *Williams*. "'[N]o subjective intent to injure a particular victim is required.  Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable.' (*People v. Felix*, *supra*, at p. 1629.)" (*Trujillo*, *supra*, 181 Cal.App.4th at p. 1353.)  Second, it reasoned that even if the defendant were not actually aware of the passenger in the car, "his mental state can be 'readily combine[d]' with the actus reus (or acti rei) of shooting at the car with two people inside to "'multiply the criminal acts for which the [defendant] is responsible.'" [Citation.]" (*Trujillo*, *supra*, 181 Cal.App.4th at p. 1354.)  "Just as 'a person maliciously intending to kill is guilty of the murder of all persons actually killed' [citation], a person who harbors the requisite intent for assault is guilty of the assault of all persons actually assaulted." (*Id.* at pp. 1354-1355.) Characterizing "the gravamen of assault" as "the *likelihood* that the defendant's action will result in a violent injury to another," the court concluded that a victim of assault is

---

[8]    He claims that Barbara's observation of only one person in the car "suggest[s] that the shooter or shooters only saw one person as well, the driver," and that Barbara's inability to identify the driver is "an indication that he was obscured from her view and vise-versa [*sic*]."

20

one for whom such injury was likely–and that the backseat passenger "nearest to defendant's fusillade of gunshots, was no less a victim of defendant's assault than the driver" of the car "even if defendant did not actually see" the passenger. (*Id.* at p. 1355.) The court found further support for this reasoning in the line of cases recognizing the "kill zone" theory of attempted murder. (See *id.* at pp. 1356-1357.) Ultimately, the court concluded that "[e]ven if the 'elastic' mens rea concept . . . or the kill zone theory do not apply here," the passenger "was a reasonably foreseeable victim of defendant's assault." (*Id.* at p. 1357.) It explained, "[t]he jurors could have reasonably found that a person with actual knowledge that he is shooting indiscriminately at a moving vehicle would realize that his conduct would directly, naturally, and probably result in a battery to anyone and everyone inside the [car]. . . . Whether defendant was subjectively aware of such risk or had the specific intent to injure any occupant of the car is irrelevant." (*Ibid.*; see also *Williams*, *supra*, 26 Cal.4th at p. 788 ["assault does not require a specific intent to injure the victim"]; *In re Tameka C.* (2000) 22 Cal.4th 190, 198 ["The underlying substantive offense of assault with a firearm does not require a specific intent to injure a particular victim."].)

The record in the instant, factually indistinguishable case compels the same conclusion. Eber and Barbara both testified that defendant unleashed a fusillade of bullets at their moving car, which he unquestionably knew was occupied by at least one person. The jury certainly could conclude that a reasonable person in defendant's shoes would realize that this act by its nature would directly and probably result in the application of force to anyone in the car. The evidence was sufficient to support the requisite mens rea finding on count 2.

## II. Challenges to All Convictions

### A. Failure to Hold *Marsden* Hearing and Appoint New Counsel

Defendant argues that his convictions must be reversed because the trial court did not conduct a hearing or appoint him new counsel as required by *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) when he indicated that he wanted to add an ineffective assistance of counsel claim to his posttrial motion for new trial. We conclude that a

21

*Marsden* hearing was not required because defendant did not provide the court with "'at least some clear indication'" (*People v. Sanchez* (2011) 53 Cal.4th 80, 90 (*Sanchez*)) that he wanted new counsel.

"The governing legal principles [derived from *Marsden*, *supra* ] are well settled. 'Under the Sixth Amendment right to assistance of counsel, ""'[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'"" [Citation.] Furthermore, ""'[w]hen a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.'"" [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 95; see also *People v. Smith* (2003) 30 Cal.4th 581, 604; *People v. Hart* (1999) 20 Cal.4th 546, 603.) These principles apply "equally preconviction and postconviction." (*People v. Smith* (1993) 6 Cal.4th 684, 694.) "A defendant is entitled to competent representation at all times, including presentation of a new trial motion or motion to withdraw a plea." (*Id.* at p. 696.)

"[A] trial court's duty to permit a defendant to state his reasons for dissatisfaction with his attorney arises when the defendant in some manner moves to discharge his current counsel. The mere fact that there appears to be a difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to hold a *Marsden* hearing." (*People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. omitted (*Lucky*.)) In *Sanchez*, the Supreme Court reiterated that a *Marsden* hearing is required only when "there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.'" (*Sanchez*, *supra*, 53 Cal.4th at p. 90; see *Lucky*, *supra*, 45 Cal.3d at p. 281, fn. 8 ["We do not necessarily require a proper and formal legal motion, but at least some clear indication by defendant that he wants a substitute attorney."].) "[W]e will not find error on the part of the trial court for failure to conduct a *Marsden* hearing in the absence of evidence that defendant

22

made his desire for appointment of new counsel known to the court." (*People v. Richardson* (2009) 171 Cal.App.4th 479, 484.) We generally review *Marsden* issues only for abuse of discretion. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245.)

Here, defendant did not clearly indicate a desire for a substitute attorney. Instead, he indicated, both through his trial counsel and in direct colloquy with the court, that he wanted to proceed in pro. per. Trial counsel told the court defendant "was thinking of proceeding in pro per," and defendant confirmed that if the motion for new trial was denied, "I would like to go pro per." When counsel asked defendant if he wanted new counsel to present the additional claim he wished to raise, "as opposed to doing it himself," defendant responded only, "I don't know much about the law." This cryptic comment did not clearly apprise counsel or the court that defendant wanted substitute counsel, especially in the context of his earlier, more explicit assertion that he wanted to represent himself.

Defendant argues that his counsel's suggestion–and the court's apparent understanding–that he wanted to add a claim of ineffective assistance of counsel to the motion for new trial was itself a sufficiently "clear indication" that he wanted a substitute attorney. We disagree. Defendant's oblique expression of dissatisfaction with his trial counsel is not akin to a request for substitute counsel. (See *People v. Burton* (1989) 48 Cal.3d 843, 855.) "Nor is it the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with counsel, the court automatically should inquire whether he would like to make a motion for substitution of counsel. [Citations.]" (*Ibid.*) *People v. Gonzalez* (2012) 210 Cal.App.4th 724, rev. denied Jan. 30, 2013 (*Gonzalez*) is illustrative. There, defendant filed a motion that his trial counsel informed the court "could be a *Marsden* matter" because "[h]e's complaining about my conduct." (*Gonzalez*, *supra*, 210 Cal.App.4th at p. 738.) The motion, which indeed claimed that trial counsel performed inadequately in a variety of ways, was accompanied by an express request by defendant to "go pro per for my sentencing and for a retrial motion." (*Id.* at p. 738.) The Court of Appeal rejected defendant's contention that the motion alone triggered the trial court's duty to conduct a *Marsden* hearing, concluding

23

that there was "no clear indication that Gonzalez was requesting a substitute appointed attorney" despite his complaints about counsel's performance. (*Id.* at p. 741.) The same is true here. Defendant was not entitled to a formal *Marsden* hearing under the circumstances of this case, in which the trial court gave him an opportunity to explain what he wanted to do in any event.

Nor was he entitled to the automatic appointment of new counsel. Defendant suggests–but does not explain why–the trial court had a duty to appoint new counsel, or, at a minimum, to conduct a *Marsden* hearing. No such duty exists. As the trial court astutely observed, and as the *Marsden* process reflects, it would be untenable to require the automatic appointment of substitute counsel any time a defendant says, "'Now I think my lawyer didn't handle some issue correctly.'" "[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel." (*People v. Smith*, *supra*, 6 Cal.4th at p. 696.) Here, defendant did not request to replace trial counsel with another attorney and therefore did not trigger the court's obligation to conduct a *Marsden* hearing. He consequently did not trigger (and could not have triggered) any subsequent obligation to appoint replacement counsel.

## B.      Adequacy of *Faretta* Waiver

The Sixth Amendment, which guarantees the assistance of counsel to criminal defendants, also guarantees a right of self-representation. (*Faretta*, *supra*, 422 U.S. at p. 834.) To exercise the *Faretta* right to self-representation, a defendant must make a voluntary, knowing, and intelligent waiver of the right to counsel. (*People v. Elliott* (2012) 53 Cal.4th 535, 592; *People v. Burgener* (2009) 46 Cal.4th 231, 240-241 (*Burgener*).) Accordingly, a defendant seeking to represent himself ""should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" [Citation.] "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather,

24

"the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' [Citation.]" (*Burgener*, *supra*, 46 Cal.4th at p. 241.) "On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel." (*Ibid.*) Defendant bears the burden of demonstrating that he did not knowingly waive his right to counsel. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1058-1059; see also *Iowa v. Tovar* (2004) 541 U.S. 77, 92.)

Defendant contends that his posttrial invocation of his *Faretta* rights was "not free, voluntary, knowing, or intelligent because it was the product of the trial court's error in not conducting a *Marsden* hearing and because the court's summary inquiry failed to establish such a waiver." We disagree on both points.

First, as discussed above, the trial court was not required to conduct a *Marsden* hearing given the absence of "at least some clear indication" that defendant wanted a substitute attorney. In any event, this case is distinguishable from *People v. Hill* (1983) 148 Cal.App.3d 744 (*Hill*), the only case defendant cites in support of his contention that "the court's failure to conduct a *Marsden* hearing or to appoint new counsel also precludes a finding that [his waiver of the right to counsel and invocation of his *Faretta* rights] was knowing, intelligent, and voluntary." In *Hill*, the defendant filed a *Faretta* motion but told the court the only reason he was doing so was because he lacked confidence in his lawyer; he explicitly stated multiple times that he did not actually want to represent himself. (*Hill*, *supra*, 148 Cal.App.3d at pp. 750-751.) The court discussed the matter off the record with defendant's previous attorneys and ultimately refused to appoint substitute counsel or permit defendant to act as cocounsel with his appointed attorney. (*Id.* at p. 750.) Defendant reluctantly proceeded in pro. per. for two days, until the court, in an "'abundance of caution,'" reappointed one of defendant's previous attorneys. (*Id.* at p.751.) When that attorney reported that defendant was uncooperative and wished to renew his *Faretta* motion, the court granted the motion but denied a continuance. (*Ibid.*) Defendant represented himself in several in limine matters, but

25

reported that he felt unprepared. (*Ibid.*) His most recently appointed attorney expressed a willingness to step back in if a continuance were provided, but "[o]n the basis of [that attorney's] unwillingness to proceed immediately with jury selection and [defendant's] previous vacillations on the question of representation, the court denied [defendant's] motion for reinstatement of appointed counsel." (*Id.* at p. 752.) Defendant consequently represented himself throughout the remainder of trial. (*Ibid.*) The appellate court concluded that the trial court erred in failing to conduct a more probing *Marsden* inquiry on the record, and that error "taint[ed]" the defendant's subsequent *Faretta* request because "'[d]efendant's decision to proceed in pro. per. was predicated upon his belief, mistaken or not, that he could not expect effective representation from the public defender's office. This belief was effectively reinforced by the court's failure to fully explore defendant's charges.'" (*Id.* at pp. 755-756.)

Here, in contrast, defendant consistently expressed a desire to proceed in pro. per., after the heavy lifting associated with trial was completed. He did not inform the court that he wanted a new attorney, nor did he indicate that he felt unable to file his desired motion without the assistance of counsel. The court asked defendant what he wanted to do, and he said he wanted to both file trial counsel's motion and represent himself and file another motion, "if that's possible." The court ultimately allowed him to do just that, after properly advising him of the risks as described below, and defendant never vacillated in his choice. *Hill* does not compel reversal here.

Neither do defendant's related contentions, that "the court's cursory inquiry" into his desire to assert his *Faretta* rights did "not constitute the searching inquiry that the waiver of the right to counsel demands," and that its warnings did not adequately apprise him of the risks he faced. The court advised defendant that he would be proceeding against an experienced prosecutor, that he would be held to the same standards as a trained attorney, and that the court would not be able to answer his questions or act as his lawyer. These admonishments, which defendant unequivocally said he understood, were sufficient in the unusual, posttrial circumstances of this case. By the time the court admonished defendant, defendant had been through trial twice, had been found guilty of

26

all the charges against him, and had reviewed, initialed, and signed an "advisement and waiver of right to counsel" that included a lengthy recitation of the "dangers and disadvantages of self-representation." He also had discussed the prosecution's recent disclosure of about 1200 pages of potential *Brady* material with his trial counsel. This record demonstrates that defendant's eyes were open to the dangers and disadvantages of self-representation.

Defendant contends that the record does not demonstrate that he was aware of the "risks of the particular case," however, because neither the written waiver form nor the court advised him of the maximum sentence he faced. It is true that the waiver form defendant signed did not contain any information about the precise charges or penalties he faced. (Compare, e.g., *People v. Jackio* (April 30, 2015, C074019) __Cal.App.4th __, [2015 WL 1956080] [waiver forms listed code sections for crimes charged in information and expressly stated "'Penalties for offense if found guilty are life in prison'" and "'Penalties for offense if found guilty are life'"].) Defendant did initial the following statement, however, indicating his understanding that he would be entering the posttrial stage of his proceedings without the assistance of counsel: "I understand that I am giving up having a professional attorney determine, if I am convicted, what post-trial motions and sentencing options I may have, and to present those motions and options to the Court." Moreover, "[t]he failure to give a particular set of advisements does not, of itself, show that a *Faretta* waiver was inadequate." (*People v. Weber, supra,* 217 Cal.App.4th at p. 1058.) Defendant's burden to demonstrate the lack of a knowing and intelligent waiver "'is not satisfied by simply pointing out that certain advisements were not given.' [Citation.]" (*Id.* at pp. 1058-1059.) This is particularly true where it was, and still is, unclear whether a court is required to advise a defendant of the maximum penalty he faces if the defendant seeks pro. pro. status after conviction (see *People v. Conners* (2008) 168 Cal.App.4th 443, 455). [9] The record as a whole indicates that defendant was

---

[9]    The Third District Court of Appeal recently held that the Sixth Amendment requires a trial court to advise a defendant "desiring to represent himself at trial of the maximum punishment that could be imposed if defendant is found guilty of the crimes,

27

familiar with "the nature and seriousness of the crimes for which he would be sentenced" (*People v. Elliott*, *supra*, 53 Cal.4th at p. 592), and we are satisfied that his waiver of the right to counsel was voluntary, knowing, and intelligent.

## C. Evidentiary Rulings

Defendant argues that several of the court's evidentiary rulings were prejudicial and require reversal. We review these rulings for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

### 1. Admission of the "Rap Poem"

Defendant contends that the court abused its discretion by admitting the "rap poem" he authored, and that he was prejudiced by the error. He concedes the poem was relevant, but argues that the probative value of the poem was dwarfed by its prejudicial effect on the jurors, whom he claims "[i]nevitably . . . used the rap poem as character evidence showing a propensity to commit crimes such as this." He also contends that the poem was cumulative, adding "little to the mountain of other evidence adduced by the prosecution on the gang allegation and [his] membership in the gang." We are not persuaded by these arguments.

Evidence Code section 352 vests the trial court with discretion to exclude otherwise relevant evidence if its probative value is substantially outweighed by the probability that admitting the evidence will unduly prolong the proceeding, prejudice the opposing party, confuse the issues, or mislead the jury. (*People v. Zepeda* (2008) 167

_____

with enhancements, alleged at the time the defendant moves to represent himself." (*People v. Jackio*, *supra*, ___Cal.App.4th at p. __.) The United States Supreme Court also has held that the trial court must advise a defendant seeking to enter a guilty plea "of the range of allowable punishments attendant upon entry of a guilty plea." (*Iowa v. Tovar* (2004) 541 U.S. 77, 81.) The precise procedural posture of a case "is significant" when determining the adequacy of *Faretta* advisements. (*People v. Jackio*, *supra*, ___Cal.App.4th at p. __.) Defendant has not cited any case holding that a court is required to advise an already convicted defendant seeking pro. per status of the maximum penalties he now faces. In our view, once a defendant has been convicted, the rationale for advising a pretrial defendant seeking pro. per. status of the sentencing consequences he faces should he be found guilty no longer applies.

Cal.App.4th 25, 34-35 (*Zepeda*); see Evid. Code, section 352.)  For the purposes of Evidence Code, section 352, "'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that '"uniquely tends to evoke an emotional bias against defendant"' without regard to its relevance on material issues.  [Citations.]"  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)  "Evidence is cumulative if it is repetitive of evidence already before the jury."  (*People v. Evers* (1992) 10 Cal.App.4th 588, 599, fn. 4.)

The poem was not unduly prejudicial.  Just like the rap lyrics properly admitted in *Zepeda* and *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372-1372, the poem that defendant admittedly authored was highly "probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it." (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35.)  Indeed, before trial began, the court told the prosecution, "I don't have a problem with you using the letter . . . to show his commitment to his gang," and the prosecutor properly argued that the poem was illustrative of defendant's "intent to commit this violent act" and "his hatred, his willingness to do violence, and his commitment to his gang."  "The mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said 'substantially' to outweigh their considerable probative value."  (*People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1373.)  Defendant's unsupported assertion that the jury improperly construed the poem as propensity evidence despite being instructed not to do so by CALCRIM No. 1403 accordingly does not demonstrate that the poem was prejudicial. We presume that jurors understand and follow the court's instructions (e.g., *People v. Edwards* (2013) 57 Cal.4th 658, 746), and CALCRIM No. 1403, which "is neither contrary to law nor misleading," "states in no uncertain terms that gang evidence is not admissible to show that the defendant is a bad person or has a criminal propensity" (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1168).  Defendant has not shown that the jury disregarded the instruction.  Nor has he persuaded us that the poem was so inherently prejudicial as to render the curative instruction ineffective.  The relatively short, written poem lacks the visceral emotional punch of the lengthy videos depicting the consequences of drunk driving found incurably prejudicial in *People v. Diaz* (2014) 227

29

Cal.App.4th 362, 383. Its contents likewise are far less damning than oral testimony from a police officer suggesting that the defendant confessed to the charged crime. (See *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.) In short, "[t]he language and substance of the [poem], although graphic, did not rise to level of evoking an emotional bias against the defendant as an individual apart from what the facts proved." (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35.)

The poem also was not cumulative simply because it was not the only piece of evidence tending to show defendant's gang affiliations and motivations. Its explicit and graphic depiction of defendant's "fealty to furthering his criminal gang activities" rendered it "differ[ent] in context from his tattoos, . . . pictures of himself flashing gang signs" (*Zepeda*, *supra*, 167 Cal.App.4th at p. 35), and the wiretap and phone evidence.

The trial court did not abuse its discretion in admitting the poem.

### 2. Admission of "Mongol Murder/Wiretap/Sweep" Evidence

Defendant also challenges the admission of what he terms the "Mongol Murder/Wiretap/Sweep" evidence. All of this evidence came from Detective Arthur Frank's testimony, summarized above. The "Mongol Murder" evidence consists of Frank's testimony regarding his investigation of a 2008 shooting directed at two members of the Mongol Outlaw motorcycle gang, one of whom was killed. Frank stated that the investigation "involved a shooting that occurred on the 210 freeway, the transition to the southbound 2. The two victims were shot at by two individuals in a car at about 2:00 o'clock [*sic*] in the morning. They were both riding motorcycles and they were both Mongol, members of the Mongol Outlaw motorcycle gang. Mr. Martin died at the scene and Mr. Hamberg was shot at and not injured." Frank further testified that he identified two members of the Toonerville gang as suspects, and that his investigation ultimately led to the creation of the Toonerville Task Force. Frank clarified on cross-examination that defendant was not a suspect in the "Mongol Murder," which "was the impetus to develop ultimately the wiretaps."

Frank then segued into testimony about the wiretaps, including the efforts he and the Task Force had to undertake to gain authorization to implement them. As we noted

30

above, defendant did not object to Frank's (and the prosecutor's) comments about the difficulty inherent in obtaining wiretaps. Frank testified about the number of monitored phone lines, the volume of intercepted correspondence, and the fact that the wiretap also included jail calls. None of the intercepted calls was introduced; Frank explained that the wiretap was not operational at the time of the Tohom shooting. Frank also told the jury that defendant was arrested at the same time as some 20-25 other Toonerville members in a coordinated arrest sweep on July 9, 2009.

Defendant contends that all of this evidence was irrelevant and therefore inadmissible. We reject this contention as to the "Mongol Murder" and wiretap evidence. We do not reach defendant's contention regarding the sweep because he did not object to the admission of that evidence before or during trial. To the contrary, his trial counsel elicited the now-objected-to information during his cross-examination of Frank, and defendant himself testified that he was arrested on July 9, 2009, and had been in custody since then. (See *People v. Lang* (1989) 49 Cal.3d 991, 1031-1032.)[10]

Only relevant evidence is admissible (Evid. Code § 350), and all relevant evidence generally is admissible. (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The "Mongol Murder" and wiretap evidence plainly clears this minimal threshold. Frank's limited testimony about a shooting that did not involve defendant was relevant to show why law enforcement sought and obtained wiretaps against the Toonerville gang. The wiretaps themselves were relevant because they led to intelligence about the relationships among gang members and the phone numbers they used to communicate with one another. That information in turn enabled law enforcement to determine that defendant's cell phone communicated with known members of the Toonerville gang on the night of the Tohom

---

[10]    Defendant argues for the first time in reply that, to the extent any of his evidentiary objections were forfeited, counsel was ineffective in failing to properly raise them below. This argument itself is forfeited because defendant did not raise it in his opening brief. (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93.)

31

shooting, thereby tending to prove that the shooting was committed for the benefit of, at the direction of, and in association with a criminal street gang.

Defendant argues that "the wiretap evidence was not used for these purposes," because the detailed "cell phone evidence regarding [his] cell phone was obtained pursuant to a search warrant, not a wiretap." Defendant is correct that the CDR regarding his cell phone was obtained pursuant to a search warrant, but he overlooks the fact that the annotations identifying the parties receiving his outgoing calls and making the incoming calls were derived from the wiretaps and the attendant investigation. This clear link between the wiretap and the annotations further undermines his suggestion that the prosecution misled the court into admitting the wiretap evidence.

Defendant also challenges Frank's (and the prosecutor's) "gratuitous description" of the arduous process required to obtain a wiretap. This contention is forfeited due to defendant's failure to object at trial. Defendant's objection to the wiretap evidence as a whole preserved most of his arguments here, but his broad pre-trial objection to the admissibility of the wiretap evidence as a whole did not excuse his obligation to object at trial if he believed the prosecution exceeded the bounds of the court's evidentiary ruling or otherwise improperly characterized or commented on the evidence. (*People v. Ramos* (2013) 216 Cal.App.4th 195, 208-209.)

In the alternative, defendant contends that the "Mongol Murder" and wiretap evidence should have been excluded as unduly prejudicial under Evidence Code section 352. We disagree. The court appropriately balanced the low risk of prejudice to defendant against the uniquely probative value of this evidence. The court expressly circumscribed the prosecution's use of this evidence, which came in only through oral testimony and was not so inherently inflammatory as to overwhelm the court's instruction regarding the proper use of gang evidence. (See *ante*, at pp. 31-32.)

**D.      Prosecutorial Error**

Defendant next contends that the prosecutor committed prejudicial error by improperly arguing "guilt by association." He points to the following excerpt of the prosecutor's closing argument, highlighting the last paragraph as most problematic:

"I said, 'Detective, this street, is this important?  Is this a major street, a major thoroughfare?'  Why would that be important?  Because whoever did the shooting, whoever did the shooting had to go there on purpose.  They didn't just encounter somebody.  They went down there on purpose.

"And if they're from Toonerville, if the shooter was from Toonerville, they went into rival territory, deep into rival territory, where it's not safe for them.  So when we're talking about specific intent to kill, that goes into the specific intent.  When you're thinking about why would you go there, to go to Fosters Freeze?  No.  There's not a Fosters Freeze here, that's on Fletcher.

"Why would you go there, to rival gang territory, unless you wanted to do harm to somebody, and you know you could do harm, because you did harm not long ago, on February 15.  They shot Steve Garcia just a block and a half up the street.  Then, in December of '08, they shoot somebody else in Rascals territory who happened to be an Echo Park gangster, but, again, it was another Toonerville gangster that shot him."

Defendant acknowledges that he did not object to this or any other portion of the prosecutor's closing argument at trial.  His silence at trial renders the claim forfeited on appeal.  "To preserve a claim of prosecutorial misconduct, a defendant must make a *timely* and *specific* objection and ask the court for a curative instruction."  (*People v. Smith* (April 27, 2015, S112442) ___Cal.4th ___ [2015 Cal. Lexis 2337].)  Defendant did neither, and we are not persuaded by his suggestion that this case involves such "pervasive prejudicial prosecutorial misconduct" as to warrant a departure from our ordinary rules of forfeiture.  (*People v. Dykes* (2009) 46 Cal.4th 731, 775, fn. 8.)  Defendant identified a single isolated instance of alleged prosecutorial error, which even if prejudicial was by no means pervasive.

We likewise are not convinced that defense counsel was ineffective in failing to object to the argument.  (See *People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).)  "'[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one' (*People v. Padilla* (1995) 11 Cal.4th 891, 942, overruled on another ground in *People v. Hill* (1998) 17

Cal.4th 800, 823), and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [Citation.]" (*Centeno*, *supra*, 60 Cal.4th at p. 675.) When the record on direct appeal sheds no light on the reason for counsel's failure to act in the manner challenged, defendant must show there was no conceivable tactical purpose for counsel's omission. (*Id.*) Defendant has not made that showing here; he merely asserts that "it cannot rationally be argued that there existed a rational tactical purpose for not objecting to the improper argument." Moreover, even if we assume both that the comment was improper and that defense counsel's failure to object to it was objectively unreasonable and deficient, we cannot conclude that defendant suffered any prejudice. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; *Centeno*, *supra*, 60 Cal.4th at pp. 674-675.) Prejudice in this context means that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *Centeno*, *supra*, at p. 676.) Here, the jury had eyewitness testimony implicating him, as well as strong circumstantial evidence that he was in contact with members of his gang around the time of a shooting that took place in rival territory. We are not persuaded that the result would have been any different had defense counsel successfully lodged an objection to the prosecutor's closing argument.

### E. Cumulative Error

Defendant's final contention is that the cumulative effect of the alleged errors discussed above deprived him of a fair trial and requires reversal of the judgment. (See *People v. Hill*, *supra*, 17 Cal.4th at p. 815.) "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*Id.* at p. 844.) Such circumstances are not present here. Because we have found no errors, defendant's claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

**DISPOSITION**

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, Acting P. J.


MANELLA, J.